**M. Ryan Casey, OSB # 152824**
ryan@rcaseylaw.com
THE CASEY LAW FIRM, LLC
358 Blue River Pkwy Unit E-417
Silverthorne, CO 80498
Tel: (970) 372-6509

*Local / Lead Counsel for Plaintiffs and Proposed Classes*

*(Additional counsel listed on signature page)*

UNITED STATES DISTRICT COURT

DISTRICT OF OREGON

PORTLAND DIVISION

| | |
|---|---|
| MORGAN QUINN, an Oregon resident, and JORGE DELGADILLO, a Florida resident, individually and on behalf of all others similarly situated,<br><br>Plaintiffs,<br>v.<br><br>LIMITLESS X INC., a Nevada corporation, LIMITLESS X HOLDINGS, INC., a Delaware corporation, and LIMITLESS PERFORMANCE INC., a California corporation,<br><br>Defendants. | Case No.<br><br>**CLASS ACTION ALLEGATION COMPLAINT**<br><br>Unlawful Trade Practices (28 U.S.C. § 1332)<br><br>DEMAND FOR JURY TRIAL |

Plaintiffs MORGAN QUINN and JORGE DELGADILLO ("Plaintiffs"), individually and on behalf of all others similarly situated in the United States and States of Oregon and Florida, bring this Class Action Complaint against Defendants LIMITLESS X INC., LIMITLESS X HOLDINGS, INC., and LIMITLESS PERFORMANCE INC. (collectively, "Defendants"), and make the following allegations based upon information and belief, except as to the allegations specifically pertaining to Plaintiffs, which are based on personal knowledge:

CLASS ACTION ALLEGATION COMPLAINT – Page 1

## NATURE OF THE ACTION

1.      This is a class action lawsuit by Plaintiffs and other similarly situated purchasers of NZT-48 (the "Product"), a purported "dietary supplement" manufactured, marketed, labeled, sold, distributed, and/or licensed for same by Defendants.

2.      When presented for sale online, the Product—which contains more than 20 substances—is described, among other things, as a "Made in USA" safe and effective "natural" "nootropic brain supplement for memory and focus" that purportedly "eliminates brain fog," improves mood through "serotonin production," and "enhances neurotransmitter health and cell membrane fluidity." These benefits, according to Defendants' marketing, are "scientifically proven."[1]

3.      All of these and other representations are false and/or misleading. The Product is not a "dietary supplement" as that term is understood by consumers since it contains an article—identified as "Mucuna pruriens 99% extract" ("MPE")—that has been approved for prescription pharmaceutical drug use.

4.      Nor is the Product comprised of "all-natural ingredients [with] no synthetic junk." In addition to various synthetic non-dietary ingredients, the Product contains various synthetic isolates, such as Caffeine HCl, Huperzine A, and Rauwolcine.

5.      As explained below, Defendants' other representations concerning the Product's purported cognitive benefits, safety, efficacy, supporting scientific evidence, and/or country of origin are false, misleading, and/or likely to deceive a reasonable consumer.

---

[1] Amazon Listing, *NZT-48 Brain Booster*, https://www.amazon.com/NZT-48-Premium-Brain-Booster-Phosphatidylserine/dp/B0CBW7V7PH/. There are also substantially similar NZT-48 products included in Plaintiffs' definition of "Product" on other Amazon pages. As of April 20, 2026, it appears the linked product page is no longer on Amazon.com – suggesting Defendants took it down shortly before suit was filed.

CLASS ACTION ALLEGATION COMPLAINT – Page 2

6.      Aside and apart from Defendants' deceptive conduct, the Product is an unapproved new drug, misbranded and/or adulterated in violation of the Federal Food, Drug, and Cosmetic Act ("FFDCA") and Florida's Drug and Cosmetic Act ("FLDCA").

7.      The Product is an unapproved new drug under the FFDCA and FLDCA. First, the presence of MPE alone renders the Product such, since MPE is an article recognized in the official United States Pharmacopeia. Levodopa (L-DOPA)—the pharmacologically active constituent of MPE—was approved by the FDA as a new drug in 1970 (NDA 016912). The 99% extract specification is consistent with pharmaceutical-grade levodopa per the United States Pharmacopeia ("USP") monograph (assay 98.0–102.0%).

8.      Second, Defendants' marketing renders the Product an unapproved new drug since the Product is intended (1) to affect the structure or any function of the body and/or (2) for use in the diagnosis, cure, mitigation, treatment, or prevention of disease.

9.      The Product is also misbranded under the FFDCA and FLDCA. As a threshold matter, the Product is misbranded as a "dietary supplement" under the FFDCA and FLDCA since it contains an article approved as a new drug. The Product is also misbranded due to Defendants' unlawful disease claims, non-permitted structure/function statements, and/or additional false and/or misleading statements.

10.      The Product is also adulterated under the FFDCA and FLDCA. In addition to presenting an unreasonable risk of illness or injury, the Product also contains (upon information and belief) new dietary ingredients which are unlawful and/or lack sufficient data to assess their safety.

11.      To be clear, Plaintiffs do not seek to enforce the FFDCA directly, as there is no private right of action under that statute. Rather, the Product's violations of the FFDCA—

including its status as an unapproved new drug, its misbranding, and its adulteration—are relevant to Plaintiffs' state-law claims because they establish that the Product is illegal to sell in interstate commerce, that Defendants' marketing representations are false and misleading as a matter of federal law, and that the Product does not possess the qualities, characteristics, and legal status that Defendants represented it to have. These federal violations inform and undergird Plaintiffs' claims under state consumer protection statutes and warranty laws, as set forth below. The FLDCA further provides a direct state-law regulatory predicate for a FDUTPA claim.

12.     In addition to breaching warranties for consumers nationwide, Defendants' conduct violates various state consumer laws, including Oregon's Unlawful Trade Practices Act, O.R.S. §§ 646.605 et seq. ("OUTPA") and Florida's Deceptive and Unfair Trade Practices Act, Fla. Stat. §§ 501.201 et seq. ("FDUTPA"), and constitutes unjust enrichment.

13.     Accordingly, Plaintiffs bring this action individually and on behalf of the Classes defined below, comprised of all individuals similarly situated within the United States and States of Oregon and Florida, to redress the unlawful and deceptive practices employed by Defendants in connection with their labeling, marketing and/or sale of the Product. Plaintiffs seek actual, statutory, and punitive damages, as well as restitution and attorneys' fees and costs.

14.     Pursuant to O.R.S. § 646.638(2), Plaintiffs will serve a copy of this Complaint on the Attorney General of the State of Oregon following its filing with this Court.

## JURISDICTION AND VENUE

15.     Jurisdiction is proper in this Court pursuant to 28 U.S.C. § 1332(d), because there is diversity of citizenship between members of the proposed Classes and Defendants. Each Defendant is incorporated and has its principal place of business outside the state in which

Plaintiffs and various members of the proposed Classes reside. Furthermore, there are more than 100 Class Members and the amount-in-controversy exceeds $5,000,000 exclusive of interest and costs.

16.    This Court has personal jurisdiction over each Defendant because each Defendant is a foreign corporation doing business in Oregon and has sufficient minimum contacts with Oregon or otherwise intentionally avails itself of the laws and markets of Oregon, through the promotion, sale, marketing and distribution of the Product in Oregon, to render the exercise of jurisdiction by the Oregon courts permissible.

17.    Venue is proper in this District under 28 U.S.C. §1391(b) and (c) because Defendants' improper conduct alleged in this complaint occurred in this judicial district, because Defendants caused harm to Plaintiff Quinn and other Class Members residing in this district, and/or because Defendants are subject to personal jurisdiction in this district.

## THE PARTIES

18.    Plaintiff MORGAN QUINN is an individual, a resident of Multnomah County, Oregon, and a member of the Nationwide and Oregon Classes alleged herein.

19.    Plaintiff JORGE DELGADILLO is an individual, a resident of Miami-Dade County, Florida, and a member of the Nationwide and Florida Classes alleged herein.

20.    Defendant LIMITLESS X HOLDINGS, INC. is a Delaware corporation with its principal place of business in California.

21.    Defendant LIMITLESS X INC. is a Nevada corporation with its principal place of business in California. Defendant Limitless X Inc. is a wholly owned subsidiary of Defendant Limitless X Holdings, Inc., and provides direct-to-consumer e-commerce services for its health and wellness products, with a primary emphasis on dietary supplements, including the Product.

22.     Defendant LIMITLESS PERFORMANCE INC. is a California corporation with its principal place of business in California. Defendant Limitless Performance Inc. is a company wholly owned by Jas Mathur, the Chief Executive Officer of Defendant Limitless X Holdings, Inc. Under a licensing agreement, Defendant Limitless Performance Inc. granted a non-exclusive license to Defendant Limitless X Holdings, Inc. to design, manufacture, promote, sell, and/or distribute NZT-48.

23.     Defendants engaged in the design, development, testing, packaging, promoting, marketing, advertising, distribution, labeling, sale, and/or licensing of the Product, and are responsible for the illegal conduct complained of herein.

24.     Plaintiff is informed and believes that at all times material hereto and mentioned herein, each Defendant sued herein was the agent, servant, employer, joint venturer, partner, subsidiary, parent, division, alias, alter ego, co-conspirator, or aider-and-abettor of the other Defendants. Plaintiff is also informed and believes that, at all times, each Defendant was acting within the purpose and scope of such agency, servitude, employment, ownership, subsidiary, alias, and/or alter ego and with the authority, consent, approval, control, influence, and ratification of each remaining Defendant sued herein.

## FACTUAL ALLEGATIONS

### A.     The Natural Nootropics Dietary Supplement Trend

25.     The nootropics or "smart drugs" trend has been growing in recent years with consumers increasingly drawn to supplements that claim to enhance cognitive function, memory, and focus, among other attributes.

26.　As the United States Department of Justice has pointed out, "nootropics" is "a term widely used to market unapproved products as 'smart drugs' and 'cognitive enhancers.'"[2]

27.　Nootropics can be divided into two broad categories: natural substances like ginkgo biloba, and synthetic compounds which are lab developed drugs approved for other uses.

28.　Many consumers are drawn to natural nootropics, believing they carry fewer risks and align with wellness trends favoring plant-based and holistic remedies. These natural options are often sold as dietary supplements with claims such as boosting memory, concentration, or stress relief.

29.　To be labeled a "dietary supplement," a product must *not* contain articles approved as new drugs by the U.S. Food and Drug Administration ("FDA"), unless the article was marketed as a dietary supplement prior to such approval. 21 U.S.C. § 321(ff). This statutory limitation reflects and reinforces ordinary consumer understanding of dietary supplements—namely, that their active ingredients are derived from traditional nutritional or botanical sources and are distinct from FDA-approved pharmaceutical drugs.

### B.　Mucuna Pruriens and Levodopa (L-DOPA)

30.　Mucuna pruriens is a tropical legume (native to Africa and Asia) naturally containing levodopa ("L-DOPA"), a precursor to the neurotransmitters dopamine, norepinephrine (noradrenaline), and epinephrine (adrenaline).

31.　In its raw botanical form, Mucuna pruriens seeds typically contain approximately 3.1–6.1% L-DOPA by weight.

32.　Levodopa is a well-established pharmaceutical compound. It was approved by the FDA as a new drug in 1970 under New Drug Application ("NDA") 016912 (trade name

---

[2] U.S. Dep't of Justice, *Fort Collins Couple Sentenced to Federal Prison for Illegally Selling Unapproved Drugs*, https://www.justice.gov/usao-co/pr/fort-collins-couple-sentenced-federal-prison-illegally-selling-unapproved-drugs (June 10, 2022).

Larodopa, now discontinued). It now exists in multiple FDA-approved drugs, typically in combination with another compound (most notably with carbidopa under the brand name Sinemet®, among others).

33.     Levodopa-containing drugs remain the gold standard for the treatment of Parkinson's disease. As the metabolic precursor of dopamine, levodopa  crosses the blood-brain barrier, where it is presumably converted to dopamine in the brain. This is thought to be the mechanism whereby levodopa relieves symptoms of Parkinson's disease.

34.     According to FDA labeling, levodopa-containing drugs should not be taken by patients taking nonselective monoamine oxidase (MAO) inhibitors (typically prescribed for depression), patients with narrow-angle glaucoma, or patients who are pregnant or nursing. In addition, FDA labeling for levodopa-containing drugs warns of potential side effects, including sudden sleep onset, hyperpyrexia, neuroleptic malignant syndrome, dyskinesia, hallucinations, and psychosis.

35.     Upon information and belief, Defendants provide none of these contraindications and warnings to consumers of the Product.

36.     The United States Pharmacopeia ("USP") maintains an official monograph for levodopa, specifying an assay purity range of 98.0–102.0%. The USP monograph defines the pharmaceutical-grade standard for the compound.

37.     When Mucuna pruriens is extracted to 99% purity—as expressly stated on the Product's label—the resulting substance is not a traditional botanical extract but is the equivalent to pharmaceutical-grade levodopa. A 99% extract falls squarely within the USP monograph's assay range of 98.0–102.0%, confirming that the Product contains pharmaceutical-grade L-DOPA.

CLASS ACTION ALLEGATION COMPLAINT – Page 8

38.    The distinction between a whole-plant botanical and a highly purified active pharmaceutical ingredient is significant. The FDA's Botanical Drug Development Guidance defines botanical as expressly excluding "[h]ighly purified substances, either derived from a naturally occurring source…or chemically modified[.]"[3]

39.    Published research has identified alarming variability and mislabeling in Mucuna pruriens supplements. A 2022 study published in JAMA Neurology found that products labeled as Mucuna pruriens supplements contained between 228% and 2,186% of their labeled L-DOPA content, demonstrating the significant and uncontrolled pharmaceutical exposure consumers face when taking these products without medical supervision.[4]

40.    Despite these known risks and regulatory actions, L-DOPA-containing Mucuna pruriens supplements continue to be unlawfully marketed, their popularity fueled by the rise of the nootropic and "biohacking" movement.

**C.    Defendants' Product and Marketing Claims**

41.    Defendants market, sell, or otherwise distribute the Product through online retail listings, including Amazon.com. In doing so, Defendants make a series of express and implied representations regarding (i) the Product's "dietary supplement" status; (ii) the nature and sourcing of its ingredients; (iii) the Product's purported cognitive and neurological benefits; (iv) the Product's safety and efficacy; and (iv) the scientific substantiation allegedly supporting those claims. Each category of claims is false, misleading, or likely to deceive a reasonable consumer.

---

[3] U.S. Food & Drug Admin., *Botanical Drug Development: Guidance for Industry* (revised Dec. 2016), at 1.

[4] Cohen PA, et al., *Quantity of Levodopa in Mucuna pruriens Supplements*, JAMA Neurology 79(11):1195-1196 (2022).

42. Defendants expressly label and market the Product as a "dietary supplement," including in the Product name, labeling, and online listings. These representations are false or misleading.

43. As sold, the Product contains an article identified as "Mucuna pruriens 99% extract," which Defendants market for its pharmacologically active effects, including dopamine and neurotransmitter modulation. "Mucuna pruriens 99% extract" is pharmaceutical grade L-DOPA (having its own USP monograph), which has been approved for prescription pharmaceutical drug use and is regulated as a drug.

44. The inclusion of such an article disqualifies the Product from lawful classification as a dietary supplement. Further, the inclusion of pharmaceutical compounds conflicts with reasonable consumers' (including Plaintiffs and Class Members) understanding of a "dietary supplement."

45. Further, by labeling the Product a "dietary supplement," Defendants falsely represent that the Product complies with the statutory and regulatory framework governing dietary supplements and conforms to consumer expectations associated with that category— namely, that the Product consists of traditional nutritional or botanical ingredients rather than drug-like active substances.

46. Defendants represent that the Product is made from "all-natural ingredients" and contains "no synthetic junk." These representations are false or misleading.

47. Contrary to these claims, the Product contains multiple synthetic or semi-synthetic isolates and compounds, including but not limited to Caffeine HCl, Huperzine A, and Rauwolcine. These ingredients are chemically extracted, refined, or synthesized and are not naturally occurring in the form or concentration present in the Product.

48.     Reasonable consumers understand "all-natural" and "no synthetic" claims to exclude chemically isolated or laboratory-produced compounds. Defendants' marketing exploits that understanding while selling a Product that does not conform to it.

49.     Defendants market the Product as a "nootropic brain supplement" that enhances memory, focus, cognition, and overall brain performance. Defendants further claim that the Product "eliminates brain fog," "enhances neurotransmitter health," and improves cognitive functioning.

50.     These claims are false or misleading because Defendants lack competent and reliable scientific evidence that the Product—as formulated, dosed, and sold—provides the advertised cognitive benefits. Any limited or ingredient-specific studies cited in support of such claims do not evaluate the Product itself, do not assess the combined effects of the Product's ingredients, and do not substantiate the broad neurological outcomes Defendants promise.

51.     Moreover, several of the Product's ingredients have no demonstrated efficacy for cognitive enhancement in healthy adults at the dosages provided, and others are associated with inconsistent, inconclusive, or non-replicable findings.

52.     Defendants represent that the Product improves mood and mental well-being through "serotonin production" and by supporting neurotransmitter balance and function.

53.     These representations are false or misleading. Defendants do not possess reliable human clinical evidence demonstrating that the Product increases serotonin levels, safely modulates neurotransmitter activity, or produces measurable mood benefits in consumers. Claims suggesting direct neurotransmitter or serotonin effects further imply drug-like mechanisms of action, reinforcing the misleading nature of Defendants' "dietary supplement" representations.

CLASS ACTION ALLEGATION COMPLAINT – Page 11

54.     Reasonable consumers interpret such claims as statements of physiological effect, not vague wellness puffery, particularly where Defendants present them as concrete mechanisms of action.

55.     Defendants repeatedly assert that the Product's benefits are "scientifically proven," "research-backed," or otherwise supported by science.

56.     These claims are false or misleading because, upon information and belief, Defendants lack competent and reliable scientific evidence substantiating the advertised benefits of the Product. Defendants do not disclose any randomized, controlled human clinical trials evaluating the Product itself for the claimed outcomes. Nor do Defendants disclose material limitations, conflicting evidence, or the absence of scientific consensus regarding the efficacy of the Product's ingredients.

57.     By claiming scientific proof without adequate substantiation, Defendants convey a level of certainty and validation that does not exist, materially misleading reasonable consumers.

58.     Defendants market the Product as safe, natural, and suitable for regular consumer use. These representations are misleading in light of the Product's inclusion of pharmacologically active compounds, stimulant isolates, and ingredients associated with potential side effects, drug interactions, or contraindications.

59.     Defendants fail to disclose material information necessary for consumers to understand the true nature of the Product, including that it contains drug-like active substances rather than purely nutritional or botanical ingredients. Nor do Defendants disclose the warnings, contraindications, and potential side effects included in FDA-approved labeling of levodopa-containing drug articles.

60.     Finally, Defendants represent that the Product is "Made in USA," including in online product listings. These representations are false or misleading.

61.     Reasonable consumers understand an unqualified "Made in USA" claim to mean that all or virtually all of the Product's components, ingredients, and processing are of domestic origin, and that any foreign content is negligible. Defendants' marketing conveys precisely that message.

62.     On information and belief, the Product does not meet that standard. One or more of the Product's ingredients—including active compounds, botanical extracts, and/or synthetic isolates—are sourced, manufactured, or substantially processed outside the United States. Those foreign components are neither incidental nor negligible to the Product's composition, function, or value.

63.     Alternatively, even if final encapsulation, bottling, or packaging occurs in the United States, Defendants' unqualified "Made in USA" claim is misleading because it implies domestic origin of the Product as a whole, rather than merely domestic assembly or packaging. Defendants fail to disclose material facts necessary to prevent that implication from misleading reasonable consumers, including the foreign origin of substantial components of the Product.

64.     By making unqualified domestic-origin claims without meeting the expectations those claims convey, Defendants misrepresent the Product's geographic origin, quality, and value, and induce consumers to pay a price premium they otherwise would not have paid.

**D.     The Product is an Unapproved New Drug in Violation of Federal and Florida Law**

65.     Under the FFDCA, drugs must either receive premarket approval by FDA through the New Drug Application (NDA) process, or conform to a monograph for a particular drug

category (as established by the FDA's Over-the-Counter Drug Review), before they go on the market. 21 U.S.C. § 355. Florida's FLDCA imposes a parallel requirement. Fla. Stat. § 499.023.

66.    This did not occur in this case, rendering the Product illegal.

67.    The Product is considered a 'drug' for multiple reasons.

68.    **First,** the Product contains Mucuna pruriens 99% extract, which is itself a drug under both the FFDCA and FLDCA. Under the FFDCA, the term "drug" means, *inter alia*, "articles recognized in the official United States Pharmacopeia[.]" 21 U.S.C. § 321(g)(1). Florida's FLDCA adopts a substantively identical definition. Fla. Stat. § 499.003(18). Levodopa (L-DOPA)—the pharmacologically active constituent comprising 99% of the Mucuna pruriens extract—is recognized in the USP with an official monograph.

69.    **Second,** a dietary supplement must "not include…an article that is approved as a new drug under section 355 of [FFDCA], certified as an antibiotic under section 357 of [FFDCA], or licensed as a biologic under section 262 of [FFDCA]." 21 U.S.C. § 321(ff)(3)(B)(i); *see also* Fla. Stat. § 500.03(1)(n)(5) (adopting FFDCA definition of "supplement"). The FDA has classified L-DOPA as an approved drug under NDA 016912 (approved 1970) and subsequent NDAs. Defendants' 99% extract specification falls within the USP monograph's assay range of 98.0–102.0%, confirming that this ingredient is pharmaceutical-grade levodopa.

70.    Thus, every Product sold, marketed, promoted, and/or distributed by Defendants is an unapproved drug, regardless of any other marketing statements associated with the sale.

71.    **Third,** the presence of L-DOPA aside, the Product as a whole is considered a 'drug' because Defendants' marketing shows it is "intended to affect the structure or any

function of the body[.]" 21 U.S.C. § 321(g)(1)(C); Fla. Stat. § 499.003(17)(c). Defendants' marketing makes, *inter alia*, structure/function claims in the following categories:

  a) Neurotransmitter modulation (e.g., "enhances neurotransmitter health," "serotonin production");

  b) Cellular membrane effects (e.g., "enhances cell membrane fluidity");

  c) Cognitive function alteration (e.g., "nootropic brain supplement for memory and focus," "eliminates brain fog"); and

  d) Mood modulation (e.g., improves mood through "serotonin production").

72. An exception applies where "a truthful and not misleading statement is made in accordance with section 343(r)(6) of this title is not a drug under clause (C) solely because the label or the labeling contains such a statement." 21 U.S.C. § 321(g)(1). Such claims are permitted only if, *inter alia*: (A) the statement describes the role of a nutrient or dietary ingredient, (B) the manufacturer has substantiation that such statement is truthful and not misleading, and (C) the statement contains, prominently displayed and in boldface type, the required FDA disclaimer. 21 U.S.C. § 343(r)(6). These structure/function statements do not fall under the exemption because Defendants neither provide the required FDA disclaimer proximate to each claim nor, upon information and belief, have substantiation for these statements.

73. **Fourth,** the presence of L-DOPA aside, the Product as a whole is considered a 'drug' because Defendants' marketing shows it is "intended for use in the diagnosis, cure, mitigation, treatment, or prevention of disease[.]" 21 U.S.C. § 321(g)(1)(B); Fla. Stat. § 499.003(17)(b). The FFDCA defines a "disease" as "damage to an organ, part, structure, or system of the body such that it does not function properly (e.g., cardiovascular disease), or a state

of health leading to such dysfunctioning (e.g., hypertension)[.]" 21 C.F.R. § 101.93(g)(1).

Defendants' claims implicate disease states in several respects:

    a)   Claims of "eliminating brain fog" implicate neurodegenerative and neurological disease states;

    b)   Claims of enhancing "serotonin production" and improving mood implicate mental health conditions including depressive disorders;

    c)   Claims of enhancing "neurotransmitter health" implicate neurological disease states and neurodegenerative conditions; and

    d)   The Product's marketing of a known dopamine precursor (L-DOPA) for cognitive and neurological effects (including the treatment of Parkinson's disease) demonstrates intent to treat or mitigate conditions associated with dopaminergic dysfunction.

74. For any one of these reasons, the Product is an unapproved new drug in violation of federal and Florida law. 21 U.S.C. § 355; Fla. Stat. § 499.023.

**E.    The Product is Misbranded in Violation of Federal and Florida Law**

75. Under the FFDCA, the "introduction or delivery for introduction into interstate commerce of any food...that is...misbranded" is prohibited. 21 U.S.C. § 331(a). Florida's FDCA likewise prohibits the manufacturing or sale of any misbranded drug. Fla. Stat. § 499.005.

76. Here, the Product is misbranded for numerous independent reasons.

77. **First,** the Product is misbranded as a supplement. The FFDCA defines a 'dietary supplement' as a product "intended to supplement the diet that bears or contains one or more of the following dietary ingredients: (A) a vitamin; (B) a mineral; (C) an herb or other botanical; (D) an amino acid; (E) a dietary substance for use by man to supplement the diet by increasing the total dietary intake; or (F) a concentrate, metabolite, constituent, extract, or combination of

CLASS ACTION ALLEGATION COMPLAINT – Page 16

any ingredient described in clause (A), (B), (C), (D), or (E)." 21 U.S.C. § 321(ff)(1); *see also* Fla. Stat. § 500.03(1)(n)(5) (adopting FFDCA definition of "supplement").

78.    Critically, a dietary supplement must "not include...an article that is approved as a new drug under section 355 of [FFDCA]." 21 U.S.C. § 321(ff)(3)(B)(i). As established above, levodopa (L-DOPA) was approved as a new drug under NDA 016912 in 1970 (and in subsequent NDAs), and L-DOPA was not marketed as a dietary supplement prior to its drug approval. The Product therefore cannot lawfully be labeled or marketed as a dietary supplement.

79.    **Second,** the Product is misbranded since it makes unlawful disease claims. A dietary supplement is misbranded where "its label or labeling represents, suggests, or implies [that the product] is adequate or effective in the prevention, cure, mitigation, or treatment of any disease or symptom." 21 C.F.R. § 101.9(k)(1); *see also* Fla. Stat. §§ 499.003(17)(b), 500.11(1)(a). As noted above, Defendants make a number of unlawful disease claims, including claims regarding brain fog, serotonin production, neurotransmitter health, and mood modulation.

80.    **Third,** as explained above, Defendants make a number of non-permitted structure/function statements, rendering the Product misbranded.

81.    Further, while the FFDCA provides for certain allowable structure/function claims, such claims are permitted only where notice is provided to the U.S. Office of Dietary Supplement Programs and the notifying firm has substantiation that the statement is truthful and not misleading. 21 C.F.R. § 101.93(a). Further, *each statement* must contain the required FDA disclaimer. 21 C.F.R. §§ 101.93(b)–(c). Upon information and belief, Defendants failed to comply with one or both of these requirements.

82.    **Fourth,** the Product makes a number of claims under the FFDCA's 'catch-all' provision rendering the Product misbranded. Under the FFDCA, "[a] food shall be deemed to be

misbranded [if] its labeling is false or misleading in any particular[.]" 21 U.S.C. § 343(a)(1); *see also* Fla. Stat. § 500.11(1)(a).

83.     Here, Defendants' labeling makes numerous false or misleading statements, including, *inter alia*: (a) claims that the Product is "all-natural" and contains "no synthetic junk" when it contains synthetic isolates; (b) claims that the Product's benefits are "scientifically proven" without adequate substantiation; (c) claims falsely implying legal status as a dietary supplement; (d) claims as to the Product's safety and efficacy; and (e) claims that the Product is "Made in USA" when substantial ingredients are foreign-sourced.

84.     For one or all of these reasons, the Product is misbranded in violation of federal and Florida law. 21 U.S.C. §§ 331(a), 343; *see also* Fla. Stat. §§ 499.005, 499.007.

### F.     <u>**The Product is Adulterated in Violation of Federal and Florida Law**</u>

85.     Independent of whether the Product is an unapproved new drug and/or misbranded, it is adulterated in violation of federal and Florida law.

86.     Under the FFDCA, the "introduction or delivery for introduction into interstate commerce of any food...that is adulterated" is prohibited. 21 U.S.C. § 331(a). The FLDCA likewise prohibits the sale of any adulterated drug. Fla. Stat. § 499.005(1).

87.     **First,** the Product is adulterated as it presents a significant or unreasonable risk of illness or injury under the conditions of use suggested in its labeling; and/or contains ingredients rendering it injurious to health. 21 U.S.C. § 342(f)(1)(A)(i); Fla. Stat. § 499.006.

88.     The Product contains pharmaceutical-grade levodopa (L-DOPA)—a prescription drug indicated for Parkinson's disease—sold without a prescription, without healthcare provider oversight, and without adequate safety warnings. L-DOPA is associated with serious adverse effects including nausea, orthostatic hypotension, dyskinesia, hallucinations, and psychiatric disturbances.

CLASS ACTION ALLEGATION COMPLAINT – Page 18

89.    The Product additionally contains Rauwolcine (α-yohimbine, a sympatholytic agent) and Huperzine A (an acetylcholinesterase inhibitor), both of which carry independent risks of adverse effects and drug interactions. The combination of these pharmacologically active compounds in a single over-the-counter product sold without medical supervision presents an unreasonable risk of illness or injury.

90.    **Second,** upon information and belief, the Product contains one or more new dietary ingredients ("NDIs") for which there is inadequate information to provide reasonable assurance that such ingredients do not present a significant or unreasonable risk of illness or injury. 21 U.S.C. § 342(f)(1)(B).

91.    Further, upon information and belief, Defendants have not submitted the required 75-day pre-market notification to the FDA for these NDIs.

92.    Thus, even if the Product is neither misbranded nor an unapproved new drug, it is nevertheless adulterated in violation of federal and Florida law. 21 U.S.C. §§ 331, 342; *see also* Fla. Stat. §§ 499.005(1), 499.006.

### G.    Defendants' Misrepresentations and Omissions Are Likely to Deceive Reasonable Consumers

93.    Defendants' fraudulent, unfair, and/or unlawful conduct stems in part from the representations and omissions provided on (or omitted from) the Product packaging and marketing presented to consumers at the point of sale.

94.    Defendants' material misrepresentations and omissions include but are not limited to the following:

    a)    The Product is a "dietary supplement," leading reasonable consumers to believe it consists of traditional nutritional or botanical ingredients and is free

of active pharmaceutical ingredients, when in fact it contains pharmaceutical-grade levodopa (L-DOPA);

b) The Product is "all-natural" and contains "no synthetic junk," leading reasonable consumers to believe the Product's ingredients are derived from natural sources, when in fact the Product contains synthetic isolates including Caffeine HCl, Huperzine A, and Rauwolcine;

c) The Product's benefits are "scientifically proven," leading reasonable consumers to believe the Product has been validated through clinical research, when in fact no competent or reliable clinical evidence supports the Product's efficacy claims as formulated and sold;

d) The Product effectively "eliminates brain fog" and enhances memory and focus, when in fact no competent or reliable scientific evidence supports these claims at the Product's labeled dosage;

e) The Product improves mood through "serotonin production" and "enhances neurotransmitter health and cell membrane fluidity," when in fact these are unsubstantiated pharmacological drug claims;

f) The Product is "Made in USA," leading reasonable consumers to believe all or virtually all of the Product's components are of domestic origin, when in fact one or more ingredients are sourced, manufactured, or substantially processed outside the United States; and

g) The Product is safe for regular consumer use as a dietary supplement, when in fact the Product contains a prescription pharmaceutical ingredient (L-DOPA) and other pharmacologically active compounds that pose risks

including adverse drug interactions, neurological side effects, and other harms when consumed without medical supervision (Defendants failed to disclose these risks).

95.     As explained herein, these statements and omissions are at best misleading and in many instances completely false.

96.     No reasonable consumer would purchase the Product had they been aware of one or more of these misrepresentations or omissions.

97.     Nor would a reasonable consumer purchase the Product had they known it was an unapproved new drug, contained active pharmaceutical ingredients, and/or was misbranded or was adulterated under federal law.

98.     As a result of Defendants' material misrepresentation and omissions, Plaintiffs and Class Members suffered injury-in-fact including an ascertainable loss of money, as measured either by the purchase price of the Product or the price premium associated with these misrepresentations and/or omissions.

## H.     Statute of Limitations, Tolling and the Discovery Rule

99.     This action was brought within one year after the Product was purchased by each Plaintiff, well within the statute of limitations for OUTPA, FDUTPA, and applicable warranty laws.

100.    Further, under the applicable laws, the limitations period applicable to the Classes is subject to delayed discovery.

101.    Plaintiffs and members of the Classes neither knew nor could reasonably have known of Defendants' unlawful, unfair, and/or deceptive conduct which gave rise to Plaintiffs' and the Class Members' damages.

102. Defendants' deceptive representations appear directly on the Product's label and Amazon listing, and were designed to appear credible and authoritative to ordinary consumers.

103. Nor would any reasonable consumer expect to purchase a dietary supplement containing active pharmaceutical ingredients.

104. Further, the falsity of Defendants' claims (as described at length herein) is not apparent from the face of the label and requires scientific or regulatory knowledge beyond that of an ordinary consumer.

### I.    **Plaintiffs' Purchases of the Product**

105. On or about September 5, 2025, Plaintiff Quinn purchased the Product from Amazon.com for $49.99, and was exposed to Defendants' unlawful and/or unfair conduct, as well as the false and/or misleading representations and omissions described herein at the point of sale.

106. Plaintiff Quinn suffered injury in fact in the form of an ascertainable loss of money, which would not have occurred absent Defendants' illegal conduct (including Defendants' violations of OUTPA and breach of warranties as outlined herein).

107. On or about February 11, 2026, Plaintiff Delgadillo purchased the Product from Amazon.com for $49.99, and was exposed to Defendants' unlawful and/or unfair conduct, as well as the false and/or misleading representations and omissions described herein at the point of sale.

108. Plaintiff Delgadillo suffered injury in fact in the form of monetary damages.

## <u>CLASS ACTION ALLEGATIONS</u>

109.    Plaintiffs bring this class action pursuant to Rule 23(b)(3) of the Federal Rules of Civil Procedure on behalf of themselves and all other persons similarly situated. These Classes which Plaintiffs seek to represent are:

The "Oregon Class":

**All persons in the State of Oregon who purchased the Product for personal use and not for resale.**

The "Florida Class":

**All persons in the State of Florida who purchased the Product for personal use and not for resale.**

The "National Class":

**All persons in the United States who purchased the Product for personal use and not for resale.**

110.    Specifically excluded from the proposed Classes are Defendants, their officers, directors, agents, trustees, parents, children, corporations, trusts, representatives, employees, successors, assigns, or other persons or entities related to or affiliated with Defendants and/or their officers and/or directors, or any of them. Also excluded from the proposed Classes are the Court, the Court's immediate family, and Court staff.

111.    Subject to additional information obtained through further investigation and discovery, the foregoing definitions of the Classes may be expanded or narrowed by amendment or amended complaint.

### <u>Federal Rules of Civil Procedure, Rule 23(a) Factors</u>

112.    **Numerosity**. Membership in the Classes is so numerous that separate joinder of each member is impracticable. The precise number of Class Members is unknown at this time

but can be readily determined from Defendants' records. Plaintiffs reasonably estimate that there are at least thousands of persons in each of the Classes.

113. **Adequacy of Representation**. Plaintiffs will fairly and adequately represent and protect the interests of the members of the Classes. Plaintiffs have retained counsel highly experienced in complex consumer class action litigation and intend to prosecute this action vigorously. Plaintiffs are members of the Classes described herein and do not have interests antagonistic to, or in conflict with, the other members of the Class.

114. **Typicality**. Plaintiffs' claims are typical of the claims of the members of the Classes. Plaintiffs and all members of the Classes purchased Defendants' Product, and—as a result of Defendants' unlawful, unfair and/or deceptive conduct—have suffered financial damage.

115. **Existence and Predominance of Common Questions of Law and Fact.** There are numerous and substantial questions of law and fact common to all Class Members sufficient to satisfy Rule 23(a), and that control this litigation and predominate over any individual issues for purposes of Rule 23(b)(3). Included within the common questions are:

   a) Whether the Product qualifies as a dietary supplement under the FFDCA;

   b) Whether the Product is an unapproved, misbranded, and/or adulterated drug in violation of the FFDCA and FLDCA;

   c) Whether the Product's ingredients are "all-natural" and not synthetic;

   d) Whether the Product's touted cognitive benefits are false or misleading;

   e) Whether Defendants have substantiation for their scientifically proven claims;

CLASS ACTION ALLEGATION COMPLAINT – Page 24

f)  Whether Plaintiffs and the Classes are entitled to actual and/or statutory damages (where applicable), and the amount of same;

g)  Whether Defendants' conduct, as alleged herein, constitutes a breach of warranties for Plaintiffs and the Classes;

h)  Whether Plaintiffs and the Classes are entitled to attorney's fees and costs, and in what amount; and

i)  Whether Plaintiffs and the Classes are entitled to declaratory and/or other equitable relief.

Federal Rules of Civil Procedure, Rule 23(b)(3) Factors

116.  **Common Issues Predominate**: As set forth in detail hereinabove, common issues of fact and law predominate because Plaintiffs' claims are based on Defendants' common course of conduct. Whether Defendants' conduct violates the FFDCA, FLDCA, OUTPA, FDUTPA, and constitutes a breach of warranty, is common to all members of the Classes (or the relevant state classes) and is the predominating issue, and Plaintiffs can prove the elements of their claims on a class-wide basis using the same evidence as would be used to prove those elements in individual actions alleging the same claims.

117.  **Superiority**. A class action is superior to other available methods for the fair and efficient adjudication of this controversy for at least the following reasons:

a)  Given the size of the claims of individual Class Members, as well as the resources of Defendants, few Class Members, if any, could afford to seek legal redress individually for the wrongs alleged herein;

CLASS ACTION ALLEGATION COMPLAINT – Page 25

b) This action will permit an orderly and expeditious administration of the claims of Class Members, will foster economies of time, effort, and expense and will ensure uniformity of decisions;

c) Any interest of Class Members in individually controlling the prosecution of separate actions is not practical, creates the potential for inconsistent or contradictory judgments and would create a burden on the court system;

d) Without a class action, Class Members will continue to suffer damages, Defendants' violations of law will proceed without remedy, and Defendants will continue to reap and retain the substantial proceeds derived from their wrongful and unlawful conduct. Plaintiffs and Class Members have suffered damages as a result of Defendants' unlawful, unfair, and/or deceptive conduct. This action presents no difficulties that will impede its management by the Court as a class action.

118. **Notice to the Class:** Notice can be accomplished by publication for most Class Members. Further, upon information and belief, most Class Members may be identified through Defendants' own records, since most sales appear to have occurred online.

119. The Class Members have suffered economic harm and suffered injury in fact as a result of Defendants' misconduct, in that each member purchased the Product whose value was diminished due to Defendants' unlawful conduct.

## **CLAIMS FOR RELIEF**

120. Based on the foregoing allegations, Plaintiffs' claims for relief include the following:

## FIRST CAUSE OF ACTION

## VIOLATIONS OF OREGON'S UNLAWFUL TRADE PRACTICES ACT

### On Behalf of Plaintiff Quinn and the Oregon Class

121.     Plaintiffs hereby incorporate by reference all preceding paragraphs as though fully set forth herein.

122.     Plaintiff Quinn brings this claim under Oregon's Unlawful Trade Practices Act, O.R.S. §§ 646.605 et seq. ("OUTPA"), on behalf of himself and the Oregon Class, who were subject to Defendants' above-described illegal conduct.

123.     Plaintiff Quinn and Defendants are "persons" within the meaning of O.R.S. § 646.605(4).

124.     Defendants are engaged in the sale of "goods" as defined by O.R.S. § 646.605(6)(a).

125.     Defendants are engaged in "trade" or "commerce" within the meaning of O.R.S. § 646.605(8), affecting consumers in Oregon and throughout the United States.

126.     Defendants engaged in the design, development, testing, packaging, promoting, marketing, advertising, distribution, labeling, and/or sale of the Product.

127.     OUTPA prohibits "unfair *or* deceptive conduct in trade or commerce ...." O.R.S. § 646.608(1) (emphasis added). Due to the conduct described herein, Defendants willfully, knowingly, and/or recklessly used and/or employed a method, act or practice declared unlawful under the OUTPA.

128.     **First,** Defendants violated O.R.S. § 646.608(1)(b) by causing the likelihood of confusion or of misunderstanding as to the source, approval, or certification of goods.

129. Through their labeling and marketing, Defendants represented that the Product was a lawful "dietary supplement," was "all-natural," was "Made in USA," and was supported by science, when in fact the Product contained pharmaceutical-like active compounds, synthetic isolates, foreign-sourced ingredients, and lacked competent and reliable scientific substantiation.

130. Defendants further caused a likelihood of confusion by marketing the Product as a safe, natural nootropic supplement suitable for regular consumer use, while omitting material facts necessary to prevent those representations from being misleading, including that the Product contains pharmacologically active compounds and stimulant isolates not commonly understood by consumers to be dietary ingredients.

131. **Second,** Defendants violated O.R.S. § 646.608(1)(e) by representing that goods have characteristics, ingredients, uses, benefits, or qualities that they do not have.

132. Specifically, Defendants represented that the Product was a lawful dietary supplement, was comprised of all-natural ingredients with no synthetic components, enhanced cognition, memory, and focus, improved mood through serotonin production, and delivered scientifically proven neurological benefits, none of which were true or substantiated.

133. Defendants also violated O.R.S. § 646.608(1)(e) by representing that the Product's claimed cognitive, neurological, and mood-related benefits were supported by scientific evidence, when Defendants, upon information and belief, lacked competent and reliable scientific testing demonstrating that the Product, as formulated and sold, produced the advertised outcomes.

134. **Third,** Defendants violated O.R.S. § 646.608(1)(g) by representing that goods are of a particular standard, quality, or grade—namely, a natural, science-backed, premium nootropic dietary supplement—when it was in fact of another.

135.   A product containing synthetic isolates, drug-like active compounds, and unsubstantiated efficacy claims is materially inferior to the product Defendants represented it to be.

136.   **Fourth,** Defendants violated O.R.S. § 646.608(1)(i) by advertising goods with intent not to provide them as advertised.

137.   Defendants promoted the Product as a natural, domestically sourced, scientifically supported dietary supplement delivering meaningful cognitive and neurological benefits, while providing consumers with a product that did not conform to those representations.

138.   **Fifth,** Defendants violated O.R.S. § 646.608(1)(d) by using deceptive representations or designations of geographic origin in connection with goods.

139.   Defendants represented that the Product was "Made in USA," conveying to reasonable consumers that all or virtually all of the Product's components, ingredients, and processing were of domestic origin, when in fact substantial ingredients and active compounds were sourced, manufactured, or processed outside the United States.

140.   Alternatively, even if final encapsulation or packaging occurred in the United States, Defendants' unqualified "Made in USA" claim was deceptive because it implied domestic origin of the Product as a whole, rather than mere domestic assembly or packaging, and omitted material facts necessary to prevent consumer deception.

141.   The foregoing representations and omissions are material to reasonable consumers, as they are important factors in deciding whether to purchase a dietary supplement and how much they pay for it.

142.   Defendants' violations of O.R.S. § 646.608 were willful because Defendants knew, or in the exercise of reasonable care should have known, that the conduct alleged herein

CLASS ACTION ALLEGATION COMPLAINT – Page 29

was likely to cause consumer confusion, misrepresented the Product's characteristics, benefits, quality, and grade, falsely represented the Product's geographic origin, constituted false advertising, and violated Oregon's Unlawful Trade Practices Act.

143.    Defendants knew, or should have known, that their labeling and marketing practices comprising such conduct were unlawful at the time the claims were created and at all relevant times thereafter. Upon information and reasonable belief, Defendants' knowledge is evidenced by one or more of the following acts, which were willful, knowing, and/or reckless:

a)    Defendants selected, sourced, formulated, and/or manufactured the Product using pharmacologically active compounds and synthetic isolates—including Mucuna pruriens extract standardized for L-DOPA, Caffeine HCl, Huperzine A, and Rauwolcine—demonstrating Defendants' actual knowledge that the Product contained drug-like and synthetic ingredients inconsistent with ordinary consumer understanding of a "dietary supplement" and "all-natural" product;

b)    Defendants' claim that Mucuna pruriens was synthesized to 99% demonstrates Defendants' knowledge of USP standards, which in turn demonstrates Defendants' awareness that the Product was an inherently illegal unapproved new drug;

c)    Defendants reviewed, approved, and controlled the Product's ingredient list and supplement facts panel, giving Defendants actual knowledge of the Product's composition at the time they simultaneously marketed the Product as "all-natural," "no synthetic junk," and a lawful dietary supplement.

d)  Defendants affirmatively chose to market the Product for specific cognitive, neurological, and mood-related outcomes—such as eliminating brain fog, enhancing neurotransmitter health, and improving serotonin production—despite knowing that it lacked competent and reliable scientific evidence demonstrating that the Product, as formulated and sold, produced those effects.

e)  Defendants' use of "scientifically proven" and similar substantiation claims reflects Defendants' knowledge that consumers place heightened trust in science-based representations, and that such claims materially influence purchasing decisions, despite Defendants' knowledge that no human clinical trials evaluated the Product itself for the claimed benefits.

f)  Defendants marketed the Product as "Made in USA" while knowing that one or more of the Product's ingredients, active compounds, or component materials were sourced, manufactured, or substantially processed outside the United States, and further knowing that an unqualified domestic-origin claim conveyed to consumers that all or virtually all of the Product was of U.S. origin.

g)  Defendants elected to make unqualified "Made in USA" claims rather than a qualified or limited origin disclosure, evidencing Defendants' knowledge that a qualified disclosure would undermine the premium value conveyed by a domestic-origin claim.

h)  Defendants operated in the dietary supplement industry and were aware of, or deliberately disregarded, well-established regulatory requirements governing

dietary supplement classification, ingredient eligibility, substantiation of efficacy claims, and geographic-origin representations, demonstrating knowledge that their marketing practices fell outside lawful bounds.

i)   Defendants' pricing and marketing strategy reflects their knowledge that the challenged representations—natural ingredients, scientific backing, cognitive efficacy, and U.S. origin—allowed them to charge a premium price compared to products that did not make such claims.

144.   Upon reasonable belief, Defendants' intent was driven by their awareness, or constructive awareness, of a consumer market for natural dietary supplements purported to deliver significant cognitive benefits and scientific support, and by their knowledge that such representations would allow Defendants to charge a higher price than for a product not making those claims.

145.   Upon reasonable belief, Defendants continue to manufacture, market, and/or sell the Product with the misrepresentations and omissions complained of herein, even after receiving or having been made aware of Plaintiffs' January 2026 and March 2026 notice letters, which cited conduct violating, *inter alia*, OUTPA.

146.   As a result of Defendants' willful and knowing (and/or reckless) violations of O.R.S. § 646.608, described above, Plaintiff Quinn and the Oregon Class suffered an ascertainable loss of money or property—whether by entering an unlawful transaction, paying an inflated price, or purchasing a product they otherwise would not have purchased.

147.   Pursuant to O.R.S. § 646.638(1), Plaintiff Quinn (on behalf of himself and the Oregon Class) seeks statutory damages in the amount of $200 or actual damages, whichever is greater.

148.    Plaintiff Quinn and the Oregon Class further seek an order declaring Defendants have violated the OUTPA.

149.    Plaintiff Quinn and the Oregon Class also seek equitable relief and attorney's fees and costs. O.R.S. §§ 646.636 and 646.638.

## SECOND CAUSE OF ACTION

## VIOLATION OF FLORIDA'S DECEPTIVE AND UNFAIR TRADE PRACTICES ACT

### On Behalf of Plaintiff Delgadillo and the Florida Class

150.    Plaintiffs hereby incorporate by reference all preceding paragraphs as though fully set forth herein.

151.    Plaintiff Delgadillo brings this cause of action under Florida's Deceptive and Unfair Trade Practices Act, Fla. Stat. §§ 501.201 et seq. ("FDUTPA"), on behalf of himself and the Florida Class.

152.    Plaintiff Delgadillo and the Florida Class are "consumers," and each Defendant is a "person" or "entity" as used in FDUTPA.

153.    At all times relevant hereto, Defendants were engaged in "trade or commerce" as defined by Fla. Stat. § 501.203(8).

154.    FDUTPA declares "[u]nfair methods of competition, unconscionable acts or practices, and unfair or deceptive acts or practices in the conduct of any trade or commerce" to be unlawful. Fla. Stat. § 501.204(1). Further, FDUTPA violations may be predicated on the violation of "[a]ny law, statute, rule, regulation, or ordinance which proscribes unfair methods of competition, or unfair, deceptive, or unconscionable acts or practices." *Id.* § 501.203(3)(c). Defendants violated FDUTPA in numerous, independent ways.

CLASS ACTION ALLEGATION COMPLAINT – Page 33

155.     **First,** Defendants violated the FFDCA and FLDCA, which proscribe unfair methods or competition as well as unfair, deceptive, or unconscionable acts or practices.

156.     As set forth in detail in Sections D, E, and F above, the Product is an unapproved new drug, misbranded, and/or adulterated in violation of both the FFDCA and FLDCA.

157.     Defendants therefore violated a statute proscribing unfair, deceptive, and/or unconscionable methods of competition, acts and/or practices.

158.     As a direct and proximate result of Defendants' violations of the FFDCA and FLDCA (and hence FDUTPA), Plaintiff Delgadillo and the Florida Class have lost money and suffered actual damages.

159.     Since the Product was an unapproved new drug, misbranded, and/or adulterated, Defendants illegally sold the Products to Plaintiff Delgadillo and the Florida Class, thereby causing Plaintiff Delgadillo and the Florida Class Members' loss of money as measured by the full purchase price.

160.     Alternatively, the Product as it was presented for sale—which is *per se* neither an unapproved new drug, misbranded, and/or adulterated—is inherently worth more than an unapproved new drug, misbranded, and/or adulterated product, which is what consumers actually received.

161.     This injury is of the type FDUTPA was designed to prevent and directly results from Defendants' conduct violating a law which proscribes unfair methods of competition, or unfair, deceptive, or unconscionable acts or practices.

162.     There is no federal or state law which affirmatively authorizes Defendants to engage in the harmful conduct alleged throughout this Complaint.

163.    **Second,** independent of whether Defendants' conduct violated the FFDCA or FLDCA, Defendants' conduct, as described throughout the complaint, constitutes unfair acts or practices in violation of FDUTPA.

164.    Defendants' practices, as described herein: offend established public policy; are immoral, unethical, oppressive, and unscrupulous; are substantially injurious to consumers; are not outweighed by any countervailing benefits to consumers; and could not have been reasonably avoided by Plaintiff Delgadillo and consumers.

165.    As described in detail herein, these practices include, among others, using the dietary supplement stream to sell a drug with serious (and potentially deadly) side effects and contraindications; as well as selling an unapproved, misbranded, and/or adulterated drug product.

166.    Given the risk to human health, these practices plainly offend public policy, are unethical and unscrupulous, and substantially injure consumers.

167.    These practices served no benefit to consumers. Consumers who have an actual medical need for levodopa could obtain a prescription, and take the drug under the care and supervision of a prescribing physician.

168.    Neither Plaintiff Delgadillo nor the Florida Class could have avoided this injury.

169.    Defendants have benefitted from the conduct complained of herein while Plaintiff Delgadillo and the Florida Class have lost money, in the form of the purchase price of the Product (or, alternatively, by receiving a product that was worth far less than the Product as represented).

170.    This injury is of the type FDUTPA was designed to prevent and directly results from Defendants' unfair conduct.

171.    **Third,** independent of Defendants' unlawful and/or unfair conduct, Defendants' conduct, as described throughout the complaint, constitutes deceptive acts or practices in violation of FDUTPA.

172.    Defendants engaged in numerous deceptive acts, practices, and/or omissions in violation of FDUTPA, as described in Section G of this complaint, which are likely to mislead consumers acting reasonably under the circumstances, to the consumers' detriment (including Plaintiff Delgadillo), causing them injury.

173.    As a direct and proximate result of Defendants' deceptive acts or practices (which violate FDUTPA), Plaintiff Delgadillo and the Florida Class have lost money and suffered actual damages. But for the acts and/or omissions, reasonable consumers would not have purchased the Product, thereby injuring them financially as measured by the full purchase price.

174.    Alternatively, the Products as they were presented for sale (containing the representations and omissions described herein at Section G) are inherently worth more than a product absent these representations and omissions, which is what consumers actually received. Defendants were able to charge more for the Product due to their deceptive acts violating FDUTPA.

175.    This injury is of the type FDUTPA was designed to prevent and directly results from Defendants' deceptive conduct.

176.    For any and all of these independent bases of liability under FDUTPA, Plaintiff Delgadillo and the Florida Class are entitled to declaratory relief, actual damages, and reasonable attorney's fees and costs.

## THIRD CAUSE OF ACTION

### BREACH OF IMPLIED WARRANTY

#### On Behalf of Plaintiffs and the Oregon, Florida, and National Classes

177.    Plaintiffs hereby incorporate by reference all preceding paragraphs as though fully set forth herein.

178.    Plaintiffs bring this claim for breach of implied warranty on behalf of themselves, the Oregon Class, the Florida Class, and the National Class.

179.    At all times relevant, all the following States and Territories have codified and adopted the provisions of the Uniform Commercial Code: Ala. Code § 7-2-314; Alaska Stat. § 45.02.314; Ariz. Rev. Stat. § 47-2314; Ark. Code. § 4-2-314; Cal. Com. Code § 2314; Colo. Rev. Stat. § 4-2-314; Conn. Gen. Stat. § 42a-2-314; 6 Del. Code. § 2-314; D.C. Code. § 28:2-314; Fla. Stat. § 672.314; Ga. Code. § 11-2-314; Haw. Rev. Stat. § 490:2-314; Idaho Code § 28-2-314; 810 Ill. Comp. Stat. 5/2-314; Ind. Code § 26-1-2-314; Kan. Stat. § 84-2-314; Ky. Rev. Stat. § 355.2-314; 11 Me. Rev. Stat. § 2-314; Md. Code. § 2-314; Mass. Gen. Law Ch. 106 § 2-314; Mich. Comp. Laws § 440.2314; Minn. Stat. § 336.2-314; Miss. Code § 75-2-314; Mo. Rev. Stat. § 400.2-314; Mont. Code § 30-2-314; Nev. Rev. Stat. U.C.C. § 104.2314; N.H. Rev. § 382-A:2-314; N.J. Stat. § 12A:2-314; N.M. Stat. § 55-2-314; N.Y. U.C.C. Law § 2-314; N.C. Gen. Stat. § 25-2-314; N.D. Stat. § 41-02-314; Ohio Rev. Code § 1302.27; Okla. Stat. tit. 12A § 2-314; Or. Rev. Stat. § 72.3140; 13 Pa. C.S. § 2314; P.R. Laws. Tit. 31, § 3841, et seq.; R.I. Gen. Laws § 6A-2-314; S.C. Code § 36-2-314; S.D. Stat. § 57A-2-314; Tenn. Code § 47-2-314; Tex. Bus. & Com. Code § 2-314; Utah Code § 70A-2-314; Va. Code § 8.2-314; Vt. Stat. 9A § 2-314; W. Va. Code § 46-2-314; Wash. Rev. Code § 62A.2-314; Wis. Stat. § 402.314 and Wyo. Stat. § 34.1-2-314.

180. At all relevant times, Defendants manufactured, marketed, distributed, warranted, and/or sold the Product (or caused the same), which Defendants placed into the stream of commerce for purchase and use by consumers, including Plaintiffs and members of the Classes.

181. Defendants impliedly warranted that the Product was merchantable and fit for the ordinary purposes for which such goods are used, including that the Product complied with applicable laws, was accurately labeled, and conformed to the affirmations of fact and descriptions made on the Product's labeling and marketing.

182. Plaintiffs and members of the Classes purchased the Product for its ordinary and intended purpose and used the Product in a manner consistent with Defendants' instructions and marketing.

183. The Product was not of merchantable quality and was not fit for its ordinary purpose because, among other things, it did not conform to:

     a) representations that it was a lawful "dietary supplement";

     b) representations that it was "all-natural" and free from synthetic ingredients;

     c) representations that it delivered the advertised cognitive, neurological, and mood-related benefits;

     d) representations that such benefits were scientifically proven; and

     e) representations regarding its geographic origin.

184. As a result of these defects and nonconformities, the Product failed to meet the reasonable expectations of consumers (including Plaintiffs and members of the Classes) and did not possess the quality, characteristics, or value that Defendants represented.

185.    Defendants' implied warranties extended to Plaintiffs and members of the Classes, who were the intended consumers and foreseeable users of the Product, and privity is not required because Defendants marketed and warranted the Product directly to consumers.

186.    Alternatively, Plaintiffs and members of the Classes are intended third-party beneficiaries of Defendants' implied warranties.

187.    Defendants breached the implied warranty of merchantability by selling a Product that was not merchantable at the time of sale and did not conform to Defendants' affirmations, promises, and representations (as explained in detail herein).

188.    Defendants were provided pre-suit notice of their breach of implied warranty in a March 2026 letter. Defendant Limitless X Inc. was provided an even earlier notice letter in January 2026 on behalf of Plaintiff Quinn.

189.    Despite these notices, Defendants (upon information and belief) failed to cure their breach of implied warranty.

190.    As a direct and proximate result of Defendants' breach of implied warranty, Plaintiffs and members of the Classes have been damaged in an amount to be proven at trial.

191.    Plaintiffs and the Class members are entitled to legal and equitable relief against Defendants, including damages, consequential damages, rescission, attorney's fees, costs of suit, and other relief as appropriate.

**FOURTH CAUSE OF ACTION**

**BREACH OF EXPRESS WARRANTY**

**On Behalf of the Plaintiffs and the Oregon, Florida, and National Classes**

192.    Plaintiffs hereby incorporate by reference all preceding paragraphs as though fully set forth herein.

193.    Plaintiffs bring this claim for breach of express warranty on behalf of themselves, the Oregon Class, the Florida Class, and the National Class.

194.    At all times relevant, all the following States and Territories have codified and adopted the provisions of the Uniform Commercial Code: Ala. Code § 7-2-313; Alaska Stat. § 45.02.313; Ariz. Rev. Stat. § 47-2313; Ark. Code. § 4-2-313; Cal. Com. Code § 2313; Colo. Rev. Stat. § 4-2-313; Conn. Gen. Stat. § 42a-2-313; 6 Del. Code. § 2-313; D.C. Code. § 28:2-313; Fla. Stat. § 672.313; Ga. Code. § 11-2-313; Haw. Rev. Stat. § 490:2-313; Idaho Code § 28-2-313; 810 Ill. Comp. Stat. 5/2-313; Ind. Code § 26-1-2-313; Kan. Stat. § 84-2-313; Ky. Rev. Stat. § 355.2-313; 11 Me. Rev. Stat. § 2-313; Md. Code. § 2-313; Mass. Gen. Law Ch. 106 § 2-313; Mich. Comp. Laws § 440.2313; Minn. Stat. § 336.2-313; Miss. Code § 75-2-313; Mo. Rev. Stat. § 400.2-313; Mont. Code § 30-2-313; Nev. Rev. Stat. U.C.C. § 104.2313; N.H. Rev. § 382-A:2-313; N.J. Stat. § 12A:2-313; N.M. Stat. § 55-2-313; N.Y. U.C.C. Law § 2-313; N.C. Gen. Stat. § 25-2-313; N.D. Stat. § 41-02-313; Ohio Rev. Code § 1302.26; Okla. Stat. tit. 12A § 2-313; Or. Rev. Stat. § 72.3130; 13 Pa. C.S. § 2313; P.R. Laws. Tit. 31, §§ 3841 et seq.; R.I. Gen. Laws § 6A-2-313; S.C. Code § 36-2-313; S.D. Stat. § 57A-2-313; Tenn. Code § 47-2-313; Tex. Bus. & Com. Code § 2-313; Utah Code § 70A-2-313; Va. Code § 8.2-313; Vt. Stat. 9A § 2-313; W. Va. Code § 46-2-313; Wash. Rev. Code § 62A 2-313; Wis. Stat. § 402.313 and Wyo. Stat. § 34.1-2-313.

195.    Defendants made express warranties to Plaintiffs and members of the Classes through written and electronic statements, affirmations of fact, descriptions of the Product, and marketing representations, including but not limited to representations that the Product:

      a)    was a lawful "dietary supplement";

      b)    was "all-natural" and contained no synthetic ingredients;

c) delivered specific cognitive, neurological, and mood-related benefits;

d) was supported by scientific proof or research; and

e) was "Made in USA."

196. These statements and representations constituted express warranties because they described the Product, promised specific characteristics and qualities, and became part of the basis of the bargain between Defendants and consumers.

197. Defendants intended for Plaintiffs and members of the Classes to rely on these express warranties, and Plaintiffs and members of the Classes did in fact rely on them in deciding to purchase the Product.

198. The Product did not conform to Defendants' express warranties because it failed to possess the characteristics, qualities, benefits, and attributes Defendants promised.

199. Defendants breached their express warranties by selling a Product that was materially different from what Defendants represented and warranted to consumers.

200. Defendants' express warranties extended to Plaintiffs and members of the Classes regardless of whether the Product was purchased directly from Defendants or through authorized retailers, including online marketplaces.

201. Plaintiffs and members of the Classes would not have purchased the Product, or would have paid less for it, had they known the truth about the Product's characteristics and qualities.

202. Defendants were provided pre-suit notice of their breach of express warranty in a March 2026 letter. Defendant Limitless X Inc. was provided an even earlier notice letter in January 2026 on behalf of Plaintiff Quinn.

CLASS ACTION ALLEGATION COMPLAINT – Page 41

203.     Despite these notices, Defendants (upon information and belief) failed to cure their breach of express warranty.

204.     As a direct and proximate result of Defendants' breach of express warranty, Plaintiffs and members of the Classes have been damaged in an amount to be proven at trial.

205.     Plaintiffs and the Class members are entitled to legal and equitable relief against Defendants, including damages, consequential damages, rescission, attorney's fees, costs of suit, and other relief as appropriate.

## FIFTH CAUSE OF ACTION

### UNJUST ENRICHMENT

**On Behalf of the Plaintiffs and the Oregon, Florida, and National Classes**

206.     Plaintiffs incorporate the factual allegations above only to the extent they are consistent with this claim.

207.     Plaintiffs plead this claim on behalf of themselves and the three Classes in the alternative under Rule 8(d)(2) and (3). As such, Plaintiffs seek relief only to the extent statutory remedies are deemed unavailable or inadequate.

208.     Even if Defendants' practices are not deemed to violate Oregon and Florida consumer-protection law, or the provisions of the UCC, Defendants nonetheless received and retained a monetary benefit from Plaintiffs and Class members as a result of the conduct described herein.

209.     Plaintiffs and Class members conferred a monetary benefit on Defendants when they purchased a product that was inherently unlawful to sell, and/or made unlawful due to the representations and/or omissions described herein.

CLASS ACTION ALLEGATION COMPLAINT – Page 42

210. Defendants accepted and retained this benefit by receiving monies, and under these circumstances, it would be inequitable for Defendants to retain the benefit, particularly if statutory remedies are unavailable or inadequate.

211. In the alternative only, the transactions at issue are void or voidable.

212. Plaintiffs and the Classes seek restitution, disgorgement, and, in the alternative, rescission.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiffs, on behalf of themselves and on behalf of the members of the Classes defined herein, pray for judgment and relief on all Causes of Action as follows:

A. Ordering that the action may be maintained as a Class Action, appointing Plaintiffs as Class Representatives, and designating Plaintiffs' counsel as counsel for the Classes;

B. Declaring that the delayed discovery rule applies and that the applicable limitations period—and the corresponding class periods—extends back to the very first date that Defendants began engaging in the unlawful conduct alleged herein;

C. Declaring that Defendants have committed the violations alleged herein;

D. Awarding actual and/or statutory (where appropriate) damages to Plaintiffs and all members of the Classes;

E. Awarding pre-judgment interest from the date of filing this suit;

F. Awarding reasonable attorney's fees;

G. Awarding costs of this suit; and

CLASS ACTION ALLEGATION COMPLAINT – Page 43

H.    Ordering such other and further relief as the Court may deem necessary or
appropriate.

## JURY DEMAND AND NOTICE TO ATTORNEY GENERAL

Plaintiffs and the Classes, by and through undersigned counsel, hereby request a trial by jury as to all issues so triable. Further, upon filing this action, this Complaint shall be mailed to the Attorney General of the State of Oregon, and proof of receipt shall be filed with this Court.

Respectfully submitted,

**THE CASEY LAW FIRM, LLC**

Dated: April 22, 2026

*/s/ Ryan Casey*
M. Ryan Casey, OSB # 152824
ryan@rcaseylaw.com
358 Blue River Pkwy Unit E-417
Silverthorne, CO 80498
Tel: (970) 372-6509

*and*

**WADE KILPELA SLADE LLP**

Gillian L. Wade (*pro hac vice* forthcoming)
gwade@waykayslay.com
Sara D. Avila (*pro hac vice* forthcoming)
sara@waykayslay.com
Marc A. Castaneda (*pro hac vice* forthcoming)
marc@waykayslay.com
2450 Colorado Avenue, Suite 100E
Santa Monica, CA 90404
Tel: (310) 667-7273

*Counsel for Plaintiffs and the Proposed Classes*

CLASS ACTION ALLEGATION COMPLAINT – Page 44